IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

RONALD HUNT,

        Defendant.

Case No. 24-cr-456

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE DERIVED
FROM GOVERNMENT'S WIRETAPS**

Defendant Ronald Hunt, by and through undersigned counsel, pursuant to 18 U.S.C. §§ 2515 and 2518(1), respectfully moves to suppress wiretap evidence or, in the alternative, for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

## Background

Law Enforcement started investigating Mr. Hunt in late 2023.[1] The investigation started when a confidential informant was arrested and identified Mr. Hunt as the individual who supplied the informant with fentanyl. The informant provided law enforcement with a phone number and nickname for Mr. Hunt. The confidential informant introduced an undercover officer to Mr. Hunt. The officer purchased narcotics from Mr. Hunt through the confidential informant in December 2023. Then, the officer began to purchase narcotics from Mr. Hunt directly in January 2024 and purchased over one hundred grams of drugs from Mr. Hunt over the course of a few months. Over the course of these months, the undercover officer recorded a number of phone calls between the officer and Mr. Hunt. Additionally, law enforcement obtained a number of photographs of Mr.

---

[1] The following recitation of facts is derived from the allegations set forth in the affidavits submitted by the Government in this matter.

1

Hunt and others they alleged were involved in unlawful activity. Law enforcement also identified a stash house or place of operations by February 1, 2024, by using physical surveillance. Investigators also monitored the pen registers and toll analysis of Mr. Hunt and co-conspirators.

On April 1, 2024, the Government prepared and submitted an affidavit ("April Affidavit) seeking an order authorizing the interception of wire and electronic communications to and from Mr. Hunt's cell phone. Exhibit 1. The April Affidavit requested the interception of communications between a phone number associated with Mr. Hunt and a series of named alleged co-conspirators, in addition to geolocation information for Mr. Hunt. The April Affidavit identified six co-conspirators and their roles: Thomas Felder, Garrett Isley, Maurice Tutt, Bernard Robinson, and Vera Jackson. The April Affidavit also identified a stash location (723 13th Street, SE, Apartment 31, and building 1220, Apartment 21). In the April Affidavit, the Government swore that agents had conducted a feasibility scan to determine whether covert cameras could be used to monitor Apartment 31; the conclusion was that they could not. Furthermore, they proffered that "[e]ven if a suitable location were found, a pole camera may show with whom HUNT is meeting, but it will not inform law enforcement of the purpose of that meeting. The Title III intercepts will better inform agents of his purpose in meeting with various individuals." April Affidavit at 39. The stated purpose of the wiretap request was to identify all the participants and the full scope of the drug conspiracy. *Id.* at 40.

On May 22, 2024, the Government sought an extension of the wiretap and prepared and submitted an affidavit ("May Affidavit"). Exhibit 2. Following the collection of information from the wiretap authorized previously, the government had new leads to track down. It had uncovered additional suspected co-conspirators, a potential distributor, in addition to suspected processes. The affiant in the May Affidavit admits that although he previously swore that a covert camera

could not be installed, that was untrue. The agents who previously determined that were, not technically, trained agents. Once the Government consulted with technically trained agents, they determined that a camera could be installed and did install one.

Additionally, by the time the May Affidavit was executed, the Government had obtained new information about the financial arrangements of the scheme. The May Affidavit noted that "Investigators have requested additional financial records via Grand Jury subpoena some of which has been received, Zelle account info for example, and is under review by the case team." Exhibit 2 at ¶ 72. The affiant, however, swore that use of the grand jury process would be unhelpful. According to the May Affidavit, while operating under the initial wiretap authorization, the Government discovered that Mr. Hunt instructed a buyer to pay his co-conspirator for narcotics via a mobile application called CashApp. The Government discovered this information by listening to a call wherein an individual asks Hunt to pay via CashApp, and Mr. Hunt, in return, provides the individual with the information to do so. May Affidavit at ¶ 29.

Large portions of the April Affidavit and May Affidavit repeat the same language verbatim. *Compare* April Affidavit (¶¶ 41-43, describing other investigative techniques) *with* May Affidavit (¶¶ 52-54); *compare* April Affidavit (¶¶ 46-52, dismissing the value of physical surveillance, confidential sources, trash searches, mail covers, search warrants, and GPS trackers) *with* May Affidavit (¶¶ 57-63); *compare* April Affidavit (¶¶ 12-15, setting forth the designated facility and objectives) *with* May Affidavit (¶¶ 12-15). The affidavits are also internally inconsistent. For example, the May affidavit asserts: "Investigators can see via pen registers and toll analysis who HUNT and co-conspirators are speaking and texting with, but not the substantive communications," May Affidavit ¶ 57, while later claiming that Also, pen register and trap and trace devices do not provide the identities of the participants." May Affidavit ¶ 66.

3

**Argument**

I.     **Legal Standard**

A defendant may move to suppress wiretap evidence and its fruits "on the grounds that (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a)(i)-(iii). The Government may only obtain a wiretap if it can show that one is necessary. 18 U.S.C. § 2518(1). To demonstrate "necessity," the Government must set forth "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). While the Government need not show that "every other imaginable method of investigation has been unsuccessfully attempted," *Williams*, 580 F.2d at 587-588, the Government must show with "specificity why in *this particular investigation* ordinary means of investigation will fail." *United States v. Stoddard*, 892 F.3d 1203, 1212 (D.C. Cir. 2018) (quoting *United States v. Robinson*, 698 F.2d 448, 453 (D.C. Cir. 1983)). The importance of the necessity component cannot be overstated; it is a "keystone of congressional regulation." *United States v. Williams*, 580 F.2d 578, 587-88 (D.C. Cir. 1978). A showing of necessity is a crucial part of protecting privacy and ensuring that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Robinson*, 698 F.2d 448, 453 (D.C. Cir. 1983) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12, (1974). Consequently, "courts have given close scrutiny to applications challenged for noncompliance and have rejected generalized and conclusory statements that other investigative procedures would prove unsuccessful." *Williams*, 580 F.2d at 587-588.

4

Importantly, the necessity requirement must be satisfied independently for the initial wiretap application and every request to extend the wiretap. *United States v. Ford*, 183 F. Supp. 3d 22, 28 (D.C. Cir. 2016).

When the Government fails to establish necessity, the wiretap is unlawful, and any evidence obtained or derived from it must be suppressed. I 8 U.S.C. §§ 2515, 2518(10). When affidavits submitted in support of a wiretap "conceal or misrepresent material facts leading a judge inappropriately to find necessity," the wiretap order is invalid. *Franks v. Delaware*, 438 U.S. 154 (1978).

**II.   The Government Did Not Run the Gamut of Normal Investigative Procedures Before Seeking Wiretap Authorization**

The Government concedes that it did not have Mr. Hunt on its radar until late 2023. It was not until an individual was detained in Maryland in December 2023 that they initiated the investigation that led to the charges in this case. Law enforcement first made contact with Mr. Hunt in December 2023. Over the course of a few short months, the Government's investigation rapidly progressed using traditional investigative techniques. The Government had a confidential informant who connected an undercover officer with Mr. Hunt. The undercover officer had successfully convinced Mr. Hunt that he was not a member of law enforcement, and he was able to purchase narcotics directly from Mr. Hunt. Law enforcement identified the main point where drug transactions were occurring, Apartment 31 at Potomac Gardens. Additionally, law enforcement had identified at least five co-conspirators and their roles. By all accounts, the Government's investigation was proceeding rapidly using traditional investigative techniques. After a few short months, with an investigation seemingly progressing, the Government sought the first wiretap in this matter. Such a request was immature as the Government had failed at

5

that point to follow through with traditional investigative techniques.

### *Pole Cameras*

The April Affidavit claimed that pole cameras were not feasible for Apartment 31. The individuals who evaluated the possibility of adding a camera were not technically trained agents, that is, agents "with training in determining feasibility, concealability, and other factors when determining if a camera can be installed in a given location." May Affidavit at P. 40, n 8. The government appears to have failed to consult an agent trained in evaluating whether a camera could be used before swearing that it could not in the April Affidavit. It cannot be the case that the FBI did not have a qualified individual available to the investigative team. The Government did not take the cursory step of evaluating the ability to use the cameras instead of disregarding their utility entirely. In the April Affidavit, the government also dismissed the utility of a pole camera, stating "investigators do not believe a pole camera at [a possible stash location] will satisfy the long-term goals of this investigation." April Affidavit at ¶ 58. In the May Affidavit, the Government discovered that a covert camera could be successfully established and was using them. Notably, they used them in the same location they previously claimed would not "satisfy the long goals of [their] investigation."

### *Financial Investigation*

Similarly, by the time the May Affidavit was executed, the Government had uncovered additional information that it could have discovered via traditional investigative techniques. For example, as the Government previously set forth in its April Affidavit, it had coordinated for several controlled purchases of narcotics with cash by an undercover officer for months leading up to the April Affidavit. Following the wiretap authorization in April, the Government had intercepted communications from an individual requesting to pay Mr. Hunt via CashApp. By

6

the time the May Affidavit was executed, the Government had indicated it requested financial records based on its discovery of this CashApp information. May Affidavit at ¶ 72. It appears that the Government, through its undercover officer, apparently made no attempt to uncover whether electronic payment methods were being used and which ones. The Government's complete failure to attempt this basic investigatory step renders its request for a wiretap premature and inappropriate. Even worse, the Government, by its own admission, had received financial documents pursuant to a Grand Jury subpoena that it had completely failed to review before requesting an extension on its initial wiretap authorization. Given the requirement that the Government prove necessity independently for each subsequent extension, this request was premature. By failing to complete a review of a wealth of additional evidence, the Government lacked grounds to assert that it needed an additional wiretap authorization.

### *Physical Surveillance*

The affidavits claim that "continued close surveillance, particularly surveillance not informed by other information, such as a wiretap, is almost certain to be detected and thus compromise the investigation." April Affidavit ¶ 46; May Affidavit ¶ 57. The Government provides no information to support its assertion that surveillance performed without a wiretap is "certain to be detected." It claims that the "large area" is a risk factor for detection, but the area to be surveilled is a singular apartment complex. Moreover, the affidavits admit that the focus of the drug transactions is a singular apartment. It strains credulity that law enforcement cannot manage to conduct physical surveillance in one apartment complex or of one apartment unit.

### III. The Government Failed to Demonstrate with Specificity That Traditional Investigative Techniques Were Unlikely to Succeed

The affidavits submitted by the government contain boilerplate conclusory language about the use of traditional investigative techniques. As explained above, traditional investigative techniques would have provided the Government with the information it sought, without it resorting to an inappropriately invasive wiretap. The government identified one of Mr. Hunt's alleged suppliers by April 2024. This individual, James Smith, was someone the government claimed told Mr. Hunt "that he could sell narcotics to Hunt for redistribution." May Affidavit at 16. However, it appears that no additional investigative actions were taken related to Mr. Smith, the individual that the government claimed was supplying Mr. Hunt. There does not appear to be any effort to follow Mr. Smith or use any other investigative tool.

### IV. The Court Should Hold a *Franks* Hearing

Should the Court decline to order immediate suppression, an evidentiary hearing is appropriate pursuant to *Franks* in light of the substantial showing that the affidavits contain material misrepresentations or omissions relevant to necessity. A *Franks* hearing is appropriate when "(1) the [wiretap] affidavit contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth." *United States v. Williams*, 827 F.3d 1134, 1146 (D.C. Cir. 2016) (quoting *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010)). The first element may also be met if the Government "knowingly and intentionally (or with reckless disregard) omitted a fact that would have defeated probable cause." *Id.* This standard applies to warrant affidavits and affidavits seeking wiretap authorization. Suppression is "an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit

8

that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008). This standard also applies to material omissions that are misleading. *Id.*

As set forth above, the Government's affidavits contain misrepresentations and omissions regarding the extent to which evidence could be obtained through traditional investigative techniques, including appropriately evaluating the possibility of using pole cameras and financial information, and the probative value of such evidence. Furthermore, the affidavits contain misrepresentations and omissions regarding the potential and probative value of evidence that had already been obtained, including information received in responses to subpoenas. The circumstances of these omissions and misrepresentations demonstrate, at a minimum, a reckless disregard for the truth, warranting a *Franks* hearing.

The Government's representations dismissing the value of vast amounts of evidence it had obtained through traditional techniques but not yet reviewed when it sought wiretap authority at a minimum evince a reckless disregard for the truth, as does the Government's failure to discover information in its possession that would contradict a finding of necessity. *See, e.g., United States v. Salemme*, 91 F. Supp. 2d 141, 371 (D. Mass. 1999), *rev'd on other grounds sub nom. United States v. Flemmi*, 225 F.3d 78 (1st Cir. 2000) ("[T]he failure to discover information in the possession of a participating investigative agency has contributed to a finding of reckless disregard."). The Government knew at the time of the May Affidavit that it had received substantial information responsive to grand jury subpoenas. However, it had not reviewed such information before leaping to seek an additional wiretap authorization. The Government's failure to even conduct any review of subpoena documents, despite their probative value, prior to applying for its subsequent wiretap, constitutes reckless disregard.

Moreover, the Government in this case knew at the time of its first wiretap application that it had not engaged actual trained officers to evaluate the feasibility of installing pole cameras to monitor the identified center of the criminal activity. Nevertheless, the Government swore in its April Affidavit that the use of such pole cameras was evaluated and was not possible. Importantly, at this time, the Government knew that such an evaluation was not made by trained individuals. Therefore, its assertion was made with reckless disregard for the truth.

The May Affidavit also contained inaccurate summaries of intercepted communications. The government represented that in an April 14, 2024 conversation, Mr. Hunt and Mr. Isley discussed "making plans for a narcotics transaction." May Affidavit at 20, ¶ 31. The government represented the following:

> 31. In addition, on April 14, 2024 at approximately 2:49 p.m. (Session 981), **HUNT** called **ISLEY**. After the two exchanged greetings, **HUNT** asked, "Hey, you got some of 'em jaunts from your man?" **ISLEY** indicated he did by saying, "I got you fool." The two made plans to meet. Based on my training and experience, I understand that the two were making plans for a narcotics transaction.

However, a review of the call belies this claim. First, there were several exchanges between the first and second quoted statements. It was not a direct response, as suggested in the affidavit. Second, and more importantly, Mr. Hunt was the speaker for both of the quoted statements. Mr. Hunt said, "I got you fool", not Mr. Isley.

The Government's mischaracterizations of intercepted communications go beyond this instance. There are other instances in the line sheets where the government mischaracterizes or adds alleged statements that are not audible on the recording. In a call between Mr. Hunt and Mr. Isley on May 1, 2024, the Government claims Mr. Hunt asked, "where are these blues." No

such statement is audible on the recording. These issues are not isolated to communications between Mr. Hunt and Mr. Isley. In a confidential marital communication between Mr. Hunt and his wife on April 2, 2024, Mr. Hunt asks his wife to send him $200.00. It appears that he is asking for the money for gambling. The Government alleges that Mr. Hunt asks his wife for $7,200.00. No such request was made. The government inflated the request by $7,000.00 in order to suggest the request was nefarious.

## Conclusion

For the foregoing reasons, the Court should suppress evidence obtained through the Government's wiretaps and evidence derived therefrom. In the alternative, the Court should conduct a *Franks* hearing to address the Government's material misrepresentations and omissions, and to determine whether suppression is warranted on that ground.


Dated: January 30, 2026                             Respectfully submitted,


                                                    *Marc Eisenstein*
                                                    Marc Eisenstein (DC Bar No. 1007208)
                                                    Coburn & Eisenstein, PLLC
                                                    1200 G Street, NW
                                                    8th Floor
                                                    Washington, DC 20005
                                                    Phone: (703) 963-7164
                                                    Fax: (866) 561-9712
                                                    marc@coburngreenbaum.com

                                                    *Counsel to Defendant*

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on January 30, 2026, a copy of the foregoing was filed with the Clerk of the Court and served on all counsel of record via e-mail.

/s/ _____
Marc Eisenstein